**Mary D. HARTNETT, et al.**

v.

**SCHERING CORPORATION**

Civ. No. L–90–2395.

United States District Court,
D. Maryland.

Oct. 27, 1992.

Robert C. Verderaime, Baltimore, Md., and Peter M. Hartnett, Liverpool, N.Y., for plaintiffs.

George E. Golomb, Baltimore, Md., and Henry R. Simon, White Plains, N.Y., for defendant.

## MEMORANDUM

LEGG, District Judge.

In this products liability suit, the Court is called upon to decide cross-motions for summary judgment filed by the plaintiffs, Mary and Joseph Hartnett, and by defendant Schering Corporation ("Schering"). Invoking federal jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship), the Hartnetts seek compensatory and punitive damages from Schering based upon physical injuries that Mary Hartnett allegedly suffered *in utero* when her mother ingested a synthetic estrogen manufactured by White Laboratories[1]. The complaint

advances counts for negligence, breach of warranty, and strict liability in tort.

The Court has reviewed the papers submitted by the parties and finds that there is no need for a hearing. *See* Local Rule 105.6 (D.Md.1989). For the reasons set forth below, the Court will GRANT Schering's motion for summary judgment, which is based upon Maryland's statute of limitations, and will DISMISS the Hartnetts' cross-motion as moot.

## I. FACTS

In February 1960, Mrs. Kathleen Dwyer, while pregnant with plaintiff Mary Hartnett, was given a prescription for a drug called Dienestrol ("DEN") by her physician, Dr. Milton Carvahlo.[2] In the mid–1970's, Mrs. Dwyer learned, through media publicity, about the dangers of Diethylstilbestrol ("DES"), a synthetic estrogen similar to DEN.[3] Unable to recall the name of the drug she had taken while pregnant with Mary in 1960 and concerned that it was DES, Mrs. Dwyer sought information. The gynecologist that she was then seeing, Dr. Mark Conan, stated that he did not think she had been given DES in 1960. Dr. Charles DiCosimo, Mary's pediatrician, told Mrs. Dwyer that it was possible that she had taken DES during her pregnancy. Neither Dr. Conan nor Dr. DiCosimo, however, had any personal knowledge regarding the matter.

Mrs. Dwyer then wrote to Dr. Carvahlo's office. She received a letter in reply stating that Dr. Carvahlo had moved from the area and that her office records were unavailable.[4] In addition, Mrs. Dwyer wrote to Lourdes Hospital, where she had given birth to Mary. The hospital wrote back that it found "no prescriptions for stilbeslerol [sic] [DES] while you were here in this

---

1. White Laboratories is a subsidiary of Schering Corporation.

2. The drug was prescribed in order to prevent a miscarriage.

3. DEN is a more potent synthetic estrogen than DES because of its chemical makeup, but the

two drugs are similar and were prescribed for similar clinical purposes. *See* Plaintiffs' exhibit 14.

4. *Mrs. Dwyer made no further attempt to find Dr. Carvahlo, who was living in Arizona, or to obtain her office records. Kathleen Dwyer Dep. at 34.*

hospital during your 1960 admission." [5]

In 1981, Mary Hartnett was hospitalized for surgery necessitated by an ectopic pregnancy. After conducting a gynecological examination of Mrs. Hartnett, her physician, Dr. James Thornton, informed her that she was a "DES daughter", that she suffered from various "stigma" of a DES-affected daughter, and that her ability to carry a pregnancy to term might be compromised because of her exposure to DES *in utero*. [6]

Following her hospitalization, Mrs. Hartnett spoke with her mother. Mrs. Dwyer described to her daughter the fruitless inquiry she had made in the 1970's. Beyond speaking with Mrs. Dwyer, Mary Hartnett made no other investigation. In 1986, Mrs. Hartnett met with an attorney and discussed the possibility of attempting to contact Dr. Carvahlo, but decided against it. [7]

In 1988, Mary and Joseph Hartnett instituted suit against Eli Lilly and Company. During the course of discovery in that suit, Eli Lilly located and deposed Dr. Carvahlo [8] and obtained Mrs. Dwyer's hospital records. Both Dr. Carvahlo and the Lourdes Hospital records revealed that Mrs. Dwyer had taken DEN rather than DES. [9] Because Eli Lilly did not manufacture DEN, the Hartnetts dismissed their suit against Lilly and brought suit in the Northern District of New York against Schering and two other manufacturers of DEN. After the district court dismissed the case without prejudice for lack of complete diversity among the parties, the Hartnetts filed the present suit against Schering in August, 1990. [10]

Schering has moved for summary judgment in its favor, arguing that the plaintiffs' claims are barred by Maryland's three-year statute of limitations. The Hartnetts, in turn, have moved for partial summary judgment on the issue of negligence. [11]

## II. STANDARDS FOR SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if the moving party can show that "there is no genuine issue of material fact" and that he is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of proof, and the Court must determine whether, viewing the evidence in the light most favorable to the non-movant, "a fair-minded jury could return a verdict for the non-movant." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). If the movant meets its burden, the burden shifts to the non-movant to delineate, with supporting admissible evidence, an issue of material fact. A "mere scintilla of evidence in support of the [non-movant's] position" shall not suffice. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

## III. STATUTE OF LIMITATIONS

Because this is a diversity action, the Court applies Maryland law. *Erie R.R. v.*

---

5. Plaintiffs' exhibit 4(c). Mrs. Dwyer did not attempt to find out which drug was prescribed for her after learning that it was not stilbeslerol [sic].

6. James T. Thornton, M.D. Aff. ¶ 5, and defendant's exhibit B (Case Summary dated 3/38/81). Between 1981 and 1988, Mary Hartnett attempted to bring a baby to term on several occasions and suffered a number of miscarriages and premature births.

7. Mary Hartnett Dep. at 52.

8. Dr. Carvahlo was in Arizona at the time.

9. The Lourdes Hospital records include portions of Dr. Carvahlo's office records. Although on microfilm and somewhat illegible, the "Medications" portion of the records indicates that Dienestrol was prescribed for Mrs. Dwyer in 1960.

10. Although venue is proper in this Court because Schering has designated an agent for receipt of service of process in Maryland, this case has no other connection with the state of Maryland. *See* 28 U.S.C. § 1391(a)(3).

11. In their cross-motion for partial summary judgment, the Hartnetts assert that Schering should be collaterally estopped from litigating the issue of liability. They contend that White Laboratories' negligence in failing to adequately test DEN was conclusively determined in *Needham v. White Laboratories*, 847 F.2d 355 (7th Cir.1988).

*Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under Maryland's choice of law provisions, statutes of limitation are deemed procedural rather than substantive and are governed by Maryland law.[12] *Turner v. Yamaha Motor Corp.,* 88 Md.App. 1, 591 A.2d 886 (1991). Thus, Maryland's three-year statute of limitations applies to the instant case.[13]

Maryland utilizes a "discovery rule" to determine the time at which a cause of action accrues for statute of limitations purposes. In *Pennwalt Corp. v. Nasios,* 314 Md. 433, 550 A.2d 1155 (1988), the Maryland Court of Appeals, the state's highest court, thoroughly discussed the application of the discovery rule. Under Maryland law, "limitations are triggered when the plaintiff knows or should have known that [s]he has a cause of action." *Id.,* 550 A.2d at 1159 [14].

A plaintiff is deemed to "know" that she has a cause of action if (i) she has "knowledge of circumstances which would cause a reasonable person in the position of the plaintiff to undertake an investigation" (i.e., she has suffered an injury of which she is aware) and (ii) an investigation "pursued with reasonable diligence would have led to knowledge of the alleged tort." *Id.* at 1163 (citations omitted). Thus, once a plaintiff has reason to know that she has been injured, she is obliged to conduct a reasonably diligent investigation and is charged, for limitations purposes, with constructive knowledge of the facts that such an investigation would have uncovered.

In products liability cases, such at the one *sub judice,* the statute of limita-

tions does not begin to run until the plaintiff knows, or through the exercise of due diligence should know, that "(1) [s]he suffered injury; (2) the injury was caused by the defendant; and (3) there was manufacturer wrongdoing or a product defect." *Id.* at 1166. Thus, the Hartnetts' cause of action accrued at the point when the plaintiffs knew, or should have known, that Mary Hartnett suffered an injury caused by a defect in the drug DEN manufactured by White Laboratories.

Schering contends that the plaintiffs' suit is barred because the Hartnetts' cause of action accrued before August 15, 1987 (three years before the plaintiffs initiated the present suit). Specifically, Schering argues that the plaintiffs' cause of action accrued in 1981, when Mrs. Hartnett was treated for an ectopic pregnancy and told by her gynecologist that she had probably been exposed *in utero* to DES. Schering asserts that this revelation should have led Mrs. Hartnett to investigate further; it further argues that, had Mrs. Hartnett done so, she would have learned that her mother had taken DEN rather than DES because the name of the drug was contained in her mother's hospital file.

In response, the plaintiffs argue that (i) Mrs. Hartnett had no duty to investigate in 1981; (ii) even if she had investigated, a reasonable investigation would not have disclosed a probable cause of action; and (iii) the plaintiffs' cause of action accrued in 1989 when Mrs. Hartnett learned that her mother had taken DEN rather than DES.[15]

---

**12.** Md.Cts. & Jud.Proc.Code Ann. § 3–903 (1989) provides, in relevant part, "[i]f the wrongful act occurred in another state ... a Maryland court shall apply the substantive law of that jurisdiction ... [n]otwithstanding th[at] fact ... a Maryland court in which the action is pending shall apply its own rules of pleading and procedure."

**13.** Md.Cts. & Jud.Proc.Code Ann. § 5–101 (1989) provides, in pertinent part, that "[a] civil action at law shall be filed within three years from the date it accrues."

**14.** This standard applies to all three counts of the plaintiffs' complaint (negligence, strict liability in tort, and breach of warranty).

**15.** Plaintiffs also contend that Mrs. Hartnett suffered a series of injuries from 1981–1988 which should be considered separately for statute of limitations purposes. The Court, however, finds the case cited by the plaintiffs in support of their contention distinguishable from the case at bar. In *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 464 A.2d 1020 (1983), the court found that "it would be unjust to require Pierce to seek damages for lung cancer at the time he discovered asbestosis because lung cancer is a separate and distinct disease from asbestosis." *Pennwalt,* 550 A.2d at 1160 (discussing *Pierce* ). The injuries suffered by Mary Hartnett were similar and related, and Mrs. Hartnett was told in 1981 that she would suffer problems in carry-

## A. *Duty to Inquire*

This is a case in which the Court must resist the temptation to make bad law because of a sympathetic plaintiff. Applying the summary judgment standard to the facts of this case, the Court concludes that a reasonable jury could only find that the plaintiffs were on inquiry notice of their cause of action more than three years before the instant suit was filed. There is uncontrovertible evidence that Mary Hartnett was notified in March 1981 by her physician, Dr. James Thornton, that she suffered from various "stigma" of a DES-affected daughter, and that her future procreative function might be compromised because of her DES exposure *in utero*.[16] Dr. Thornton's diagnosis was confirmed in 1982 by Dr. El Hassan, a DES specialist who informed Mrs. Hartnett that her exposure to DES might render her incapable of bringing a child to term.[17] The Court thus finds, as a matter of law, that Mary Hartnett knew of facts sufficient to cause a reasonable person to investigate further in 1981 or, at the latest, 1982.[18]

The Court is mindful that, in 1977, Mrs. Hartnett's mother made an unsuccessful attempt to locate Dr. Carvahlo and to determine whether she had ingested DES while pregnant. The plaintiffs attempt to avoid the statute of limitations bar by contending that Mrs. Dwyer's earlier investigation misled Mrs. Hartnett into believing that her mother's office records were not available and that there was no relevant information in the hospital records. The Court finds this argument insufficient, as a matter of law, to excuse Mary Hartnett from her obligation to conduct an investigation in 1981. When plaintiff was advised by her physician in March, 1981 that she was a DES daughter, she was obliged to conduct a reasonably diligent *independent* investigation into the cause of her health problems, which she failed to do.

## B. *Knowledge of Probable Cause of Action*

Because Mary Hartnett was put on inquiry notice in 1981, she is charged with constructive knowledge of the information that a reasonably diligent investigation would have uncovered. Had the plaintiffs undertaken such an investigation in 1981, they would have discovered that (i) Mrs. Dwyer had taken DEN; (ii) the DEN was manufactured by White Laboratories and (iii) there was probable manufacturer wrongdoing or product defect.

Although the Hartnetts contend that Dr. Carvahlo, the physician who prescribed DEN for Mrs. Dwyer, had moved from the area, he had relocated to Arizona and could have been found.[19] More importantly, Mrs. Hartnett failed to obtain her mother's hospital records from Lourdes Hospital, which would have revealed in 1981 that Mrs. Dwyer had taken DEN prior to Mary Hartnett's birth.[20] This Court finds that, in cases involving medical issues, a reasonably diligent investigation must, at a minimum, include obtaining and reviewing all available medical records.

Had Mrs. Hartnett located Dr. Carvahlo or her mother's medical or hospital records, plaintiffs would have learned in 1981 or 1982 that Mrs. Dwyer had been exposed to DEN. Plaintiffs also could have learned

---

ing a baby to term. Therefore, the Court will not consider Mrs. Hartnett's injuries separately in determining when her cause of action accrued.

16. Defendant's exhibit B.

17. Mary Hartnett Dep. at 19, 31.

18. In 1986, when Mary Hartnett underwent a surgical procedure to reinforce her cervix, Dr. Thornton again notified Mrs. Hartnett that she had been exposed to DES *in utero* and that this exposure was the cause of her problematic pregnancies. Mary Hartnett Dep. at 36.

19. Mrs. Hartnett admits that she discussed the possibility of attempting to locate Dr. Carvahlo with an attorney in 1986, but decided against doing so. Mary Hartnett Dep. at 51–52. As noted *infra*, Eli Lilly was able to locate Dr. Carvahlo in Arizona.

20. Mary Hartnett could have obtained these records by employing legal process under the Public Health law of New York state. It is clear that Mrs. Hartnett could have made out a *prima facie* cause of action, as required by the statute. *See In re Pelley*, 43 Misc.2d 1082, 252 N.Y.S.2d 944 (1964).

through reasonable investigation that White Laboratories, a subsidiary of Schering, was the probable manufacturer of the DEN Mrs. Dwyer had taken in 1960.[21] In addition, there was information available to plaintiff in 1981 which indicated manufacturer wrongdoing on the part of White Laboratories.[22] Thus, plaintiffs' cause of action accrued in 1982 at the latest,[23] and the statute of limitations had run long before 1990, the year in which this action was filed.

Accordingly, the Court is duty bound to grant Schering's Rule 56 motion and to enter summary judgment against the plaintiffs. As a result, the Court will also dismiss plaintiffs' cross-motion for summary judgment as moot.

---

21. The pharmacy at which Mrs. Dwyer filled her prescription only carried DEN manufactured by White Laboratories. Leonard Dwyer Dep. at 40.

22. In 1971, the FDA proscribed the use of DEN for prevention of miscarriages. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 7 (2d Cir.1983). In 1979, a plaintiff won an $800,000 judgment against White Laboratories because the DEN she was exposed to *in utero* caused her to develop cancer. *See Needham v. White Laboratories*, 639 F.2d 394 (7th Cir.1981). In 1982, Schering brought suit against its insurers for payment of millions of dollars in damage awards to successful plaintiffs suffering injuries from DES and DEN. *Schering Corp. v. Home Ins. Co.*, 544 F.Supp. 613 (E.D.N.Y.1982).

23. This analysis applies to plaintiffs' negligence and breach of warranty claims as well. *See Pennwalt*, 550 A.2d at 1164–66.